| | | |
|---|---|---|
| JACINDA JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:12-CV-426-TLS |
| | ) | |
| ST. CATHERINE HOSPITAL, INC. and | ) | |
| COMMUNITY FOUNDATION OF | ) | |
| NORTHWEST INDIANA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

The Plaintiff, Jacinda Jackson, alleges that the Defendants violated Title VII of the Civil Rights Act of 1964 by taking retaliatory actions and discriminating against her on the basis of her race and gender. The Defendants maintain that no genuine issues of material fact exist and that summary judgment should be entered in their favor. For the reasons set forth in this Opinion and Order, the Court finds that no reasonable jury could find in favor of the Plaintiff. Accordingly, the Defendants are entitled to judgment as a matter of law.

## PROCEDURAL BACKGROUND

On October 18, 2012, the Plaintiff filed a Complaint [ECF No. 1, Cause No. 2:12-CV-426] against St. Catherine Hospital, Inc., for discrimination on the basis of race, color, and sex, and for retaliation. On November 4, 2013, the Plaintiff filed a Complaint [ECF No. 1, Cause No. 2:13-CV-395] against Community Foundation of Northwest Indiana alleging discrimination on the basis of race and retaliation. In May 2014, the Court issued an Order [ECF No. 31] granting the Defendant's Motion to Consolidate Case No. 2:13-CV-395 with Case No. 2:12-CV-426 [ECF No. 23, Cause No. 2:12-CV-426].

On January 16, 2015, the Defendants filed their Motion for Summary Judgment [ECF No. 37], to which the Plaintiff responded [ECF No. 40]. The Defendants filed a reply brief [ECF No. 45], in addition to two motions to strike [ECF Nos. 41, 43] directed at portions of the Plaintiff's Response in Opposition, her Statement of Material Facts, and her Affidavit. The Court will not issue a separate decision pertaining to the motions to strike. As the Court addresses the legal issues presented by the Defendants' Motion for Summary Judgment and the Plaintiff's Response in Opposition, it will analyze the facts under the governing procedural and substantive law. In doing so, the Court will necessarily consider the admissibility of any evidence, including whether the parties have offered irrelevant, inadmissible, conclusory, or speculative assertions that should be disregarded in ruling on the Motion for Summary Judgment.

**FACTUAL BACKGROUND**

**A.    The Parties**

Since 2006, the Plaintiff has been employed as a registered nurse in the Registry/Supplemental Staffing Department (Registry Department) for Defendant St. Catherine Hospital, located in East Chicago, Indiana. On February 17, 2013, the Registry Department was transferred to Defendant Community Foundation of Northwest Indiana (CFNI), the parent company of St. Catherine Hospital. CFNI is a non-profit entity that serves as the parent company for three acute care hospital facilities as well as other related entities. Together, these entities are known as the Community Healthcare System (the System). The Registry Department's management structure did not change as a result of the transfer. The Plaintiff continues to be employed as a registered nurse within the Registry Department, but her paycheck is now issued

through CFNI's payroll instead of through St. Catherine's.[1]

Ronald Jerzyk, Anthony Ferracane, Melinda McBride, and Susan Alonzo all had interactions with the Plaintiff related to her employment. She alleges that all of them engaged in unlawful conduct. Jerzyk was the Human Resources Director for the Defendant until his retirement in March 2014. Ferracane is the Vice President of Human Resources for CFNI, with authority over all human resources functions within the hospital system. Ferracane also supervised the Registry Department in conjunction with the Department's management personnel, consisting of McBride and Alonzo. McBride is the Administrative Manager in the Registry Department, and Alonzo is a Supervisor/Clinician. They have equal supervisory authority over the Plaintiff.

**B.      The Registry Department and the Stafferlink System**

The purpose of the Registry Department is to provide a pool of nurses who can meet the supplemental staffing demands of other departments within the System. The Defendant uses a computer data base system, called Stafferlink, to staff these other departments with Registry Department nurses. Through Stafferlink, the registered nurses within the Registry Department apply for available shifts within other departments. The list of open shifts is generated by each hospital based on the department staffing needs, and entered in the Stafferlink system by the department seeking staffing or by the Registry Department. A nurse can use her personal login information to access Stafferlink from any computer. Once logged in, the nurse has access to

---

[1] Instead of referring to the Plaintiff's employer as two entities, the Court will use singular "Defendant" throughout the remainder of this Opinion.

available positions where she is qualified to work based on her credentials and training, and within the specific departments she has elected to work. Once a nurse applies for a specific shift, the Registry Department Staffing Coordinator accepts it, generally on a first-come basis. When a Registry Nurse's shift is scheduled and approved, it is no longer available to other nurses through Stafferlink.

Some of the Registry Nurses, including the Plaintiff, signed Scheduling Agreements with particular departments. These contracts were in effect for specific lengths of time, varying from as short as four weeks to as long as sixteen weeks. Any shifts that the Plaintiff scheduled through her Scheduling Agreements were not visible to other nurses on Stafferlink. In addition, the Plaintiff was able to apply for open and available shifts in other departments where she was qualified to work.

The Plaintiff has generally contracted to work for the Intermediate Care Unit (IMCU) North at Community Hospital. More recently, in mid-2014, the Plaintiff began to contract with IMCU West at Community Hospital. In April 2014, the Plaintiff began to sign Scheduling Agreements for 24 hours per week, as opposed to the 40 hours per week she had previously scheduled. However, more hours were still available for scheduling through Stafferlink.

When another department approved a Registry Nurse's shift, the Registry Department did not reject that approval, even if it resulted in overtime. The Plaintiff worked more overtime hours than any other Registry Nurse in 2012 and 2013. In 2014, the year she began to reduce her contractual hours, she was eighth on the list of fifty-four Registry Nurses.

C.    **Employment Issues**

Between May and August 2012, Jerzyk, Ferracane, McBride, and Alonzo addressed a series of emails, correspondence, and complaints submitted by the Plaintiff.[2]

In April 2012, the Defendant revised its policies pertaining to the Registry Department and advised all employees to review the documentation and sign it by May 7, 2012. The Plaintiff advised Alonzo that she had serious concerns and questions regarding the new policy, including the elimination of shift differential pay. Around this same time, the Plaintiff also complained that she had not received an automated message containing important information, and that she was not able to participate in training. The Defendant employs what it calls a Problem Solving Procedure Policy, but it is not available to Registry employees. On July 20, 2012, and August 6, 2012, the Plaintiff submitted forms pursuant to the Defendant's Problem Solving Procedure Policy. Alonzo and McBride considered the substance of the Plaintiff's complaints, found them to be without merit, and informed the Plaintiff of their conclusions.

On July 3, 2012, Jerzyk and the Plaintiff spoke by telephone to discuss the Plaintiff's complaints. On August 3, 2012, both Jerzyk and Ferracane met with the Plaintiff to discuss her complaints about her supervisors and Registry Department policies. On August 15, 2012, Ferracane wrote the Plaintiff a letter responding to the "written and verbal questions, concerns and complaints" that she had raised over the past months. (ECF No. 39-4 at 51.) This included her correspondence and emails dated April 27, April 30, May 9, May 12, May 13, June 26, June 29, July 2, July 5, July 11, July 20, July 23, and August 6, 2012. Ferracane indicated that the

---

[2] The Court does not address each one, but provides a sampling. To the extent a particular communication or exchange is material to the outcome of the summary judgment motion, the Court will discuss it further in the Legal Analysis section of this Opinion.

Plaintiff had already received verbal and written responses to most of her concerns, but that he was reiterating those responses in his correspondence. Ferracane wrote that he determined that her allegations of discrimination, retaliation, harassment, and unfair treatment with respect to her employer were unfounded. He specifically examined the actions and communication of McBride and Alonzo, which he found to be "very appropriate and reasonable." (*Id.*) He advised that she had not been denied the opportunity for employee training or other benefits afforded to other Registry Department employees, and explained that the revised policies and procedures affected all employees within the Registry Department. He stated that she, along with all other Registry Nurses, were instructed to execute a new Registry Agreement by May 7, 2012. The Plaintiff had elected not to execute the Agreement, but to question and resist her supervisors' instructions. Even though McBride and Alonzo conferred with her on several occasions and responded to her questions, and advised that compliance was mandatory, she did not sign the Agreement until July 11, 2012. Ferracane wrote:

> In my opinion, Ms. McBride and Ms. Alonzo were extremely patient and lenient in respect to your failure to comply with their directives. Such insubordination and refusal to follow instructions can constitute the basis for Corrective Action and clearly a basis to remove you from the Registry schedule. You can hardly assert that you were treated unfairly or in a discriminatory manner in respect to this issue.

(*Id.* at 52.) Ferracane went on to discuss the Plaintiff's other complaints and to explain why her supervisors' actions were reasonable. He reminded her that her supervisors were charged with the duty to review, monitor, and control the conduct of employees under their supervision; and that such activity was not, as she perceived it, harassment.

Ferracane's letter also addressed the Plaintiff's complaints about Jerzyk, the Director of Human Resources. He noted that Jerzyk had not been inappropriate, abusive, or threatening

during the meeting they both attended on August 3, 2012. Ferracane assured the Plaintiff that he had reviewed her concerns thoroughly, while advising that she could not, as she argued, proceed through the hospital's Problem Solving Process, as it was not available to Registry Department employees. In any event, many of her concerns were not the type that would be subject to the Problem Solving Process for any employee.

Ferracane also addressed the Plaintiff's correspondence of August 6, 2012, in which she alleged that Ferracane failed to monitor and control the actions of Jerzyk. Ferracane stated that he had honored her request to review the matters, had done so in a fair and impartial manner, and that her allegations were unfounded. Ferracane assured the Plaintiff that she had not been singled out for disparate treatment, but given legitimate instructions and directives. He also reminded her that it was within the prerogative of the hospital or any of its departments to eliminate shift differential pay, as was done in the Registry Department.

Ferracane noted the Plaintiff's statement that she wanted to withdraw her execution of the Registry Department Agreement that she signed on July 11, 2012. He stated that the Agreement was a condition of her continued employment, and that if she truly intended to rescind the Agreement, she would be effectively resigning her employment. He assumed that was not her intention, but asked her to advise him in writing if she in fact wanted to withdraw her execution of the Agreement. He concluded by stating that he hoped the letter would assist her in understanding the need for compliance with the directive of her supervisors and for compliance with the policies and procedures of her department, which could be revised periodically. He stated that he hoped that her employment relationship would continue.

By June 26, 2012, the Plaintiff had filed a Charge of Discrimination with the EEOC. She

filed the related lawsuit on October 18, 2012.

### D. February Discipline

In February 2013, the Plaintiff experienced problems with Stafferlink. She expressed her concerns by sending an email to McBride and Alonzo. McBride responded, "our records indicate you are receiving the messages," and that Alonzo had already addressed the issue in May. (Feb. 5, 2013, email, ECF No. 39-4 at 65.) On February 7, the Plaintiff wrote back. She stated that her communication had been intended for Alonzo; that the issue may have been addressed in May 2012, but it had not been resolved; and that she had proof it had not been resolved. She explained that she was being made aware of staffing needs at only two of three hospitals, despite there being a need at all three. McBride again responded, stating that the same calls were sent to all the Registry Nurses and that the automated messages had been validated. She closed by stating, "[f]rom our perspective, the issue from May has been resolved. It is over 8 months old and we need to look forward." (Feb. 8, 2013, email, ECF No. 39-4 at 64.) The Plaintiff wrote back:

> The tone of your response is very unprofessional, and is hostile and dismissive. As a professional, I do not wish to take part in any such a dialogue as this. Your email proves that it is clearly not your goal to reach resolution, but rather, to dismiss me and shut me down. "Looking forward", I will again state that the email written 02/05/2013 at 0520am was intended for Ms. Susan Alonzo, and I am, again asking (for a second time) that if I should not be speaking with Ms. Alonzo, that you please advise me as to whom I should be speaking with. Otherwise, as I stated before, I have no desire to go back and forth with you, and I definately [sic] will not continue to subject myself to your hostility and dismissiveness. It is this very unprofessional dismissiveness that continues to perpetuate a hostile environment. Again, I do not wish to be a part of that.

(*Id.*)

On February 19, 2013, McBride and Alonzo prepared and submitted a Counseling

Record to the Plaintiff based on the statements made in her email communication of February 8, 2013. She was advised that her correspondence was rude, disrespectful, and insubordinate, and that she did not have the prerogative to determine which supervisor she would communicate with. The Counseling Record was not placed in her personnel file. A Corrective Action Policy maintained by the System provided for progressive corrective action. It identified the following types of disciplinary actions: Employing Counseling/Coaching; Written Warning; Suspension; and Dismissal. The difference between counseling and a written warning is that the written warning is sent to human resources to be logged and placed in the employee's personnel file. Although documentation for employee counseling is kept in a departmental file, it is not logged in the personnel file. Counseling is "an instructional tool rather than a punitive measure." (Corrective Action Policy, ECF No. 39-2 at 3, 11.) However, acquiring three corrective actions of any kind during a twelve-month period was grounds for termination of employment.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is the moment in litigation where the nonmoving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court should only deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citing *United States v. 5443 Suffield Terrace*, 607 F.3d 504,

510 (7th Cir. 2010); *Swearnigen–El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010)). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. [A] court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Material facts are those that are outcome determinative under the applicable law. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

## LEGAL ANALYSIS

### A.      Gender Discrimination Claim

Discrimination under Title VII may be proven under either the direct or indirect method of proof. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). "Under the 'direct method,' the plaintiff may avoid summary judgment by presenting sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). Two types of evidence are permissible under the direct method: (1) evidence that would prove the fact in question without reliance on inference or presumption (direct evidence); and (2) evidence that

allows a factfinder to infer intentional discrimination by the decision maker (circumstantial evidence). *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe*, 20 F.3d at 737). Relevant circumstantial evidence includes "suspicious timing or ambiguous statements, evidence that others outside the protected class were systematically treated better, or evidence that the employer gave a pretextual reason for the adverse employment action." *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 877 (7th Cir. 2014). "Regardless of the type of evidence presented, the direct method is used when that evidence would permit the trier of fact to find that unlawful discrimination caused the adverse job action." *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014). In this case, the Plaintiff believes that Jerzyk's treatment of her during a meeting on July 3, 2012, is sufficient evidence from which a jury could find that the Plaintiff's gender motivated the Defendant to take adverse employment action.

In response to the Defendant's request for summary judgment, the Plaintiff maintains that her gender-based discrimination claim is based on the direct method. As support, she points to the "facts surrounding her treatment during the July 3, 2012 meeting with Ron Jerz[y]k and Tony Ferracane." (Pl.s' Resp. 9, ECF No. 40.) According to the Plaintiff, when she met with Jerzyk, he spoke to her "in a hostile manner and refused to take [her] complaints seriously." (*Id.*) He informed her "that she was being too emotional." (*Id.*) The Plaintiff believes that Jerzyk's "unwillingness to address her complaints based on the emotional content of her plea was motivated by gender-based animus." (*Id.*) This is the entirety of the Plaintiff's analysis of her Title VII gender discrimination claim.

The July 3, 2012, meeting is not mentioned in the Plaintiff's Statement of Material Facts in Dispute. The Plaintiff's Statement does reference an August 3, 2012, meeting with Jerzyk and

Ferracane. Whether the Plaintiff intended to reference the July 3 meeting or the August 3 meeting (she participated in meetings on both dates), is not critical to the claim. According to the Plaintiff's Affidavit, "Jerz[y]k yelled and screamed" at her, "was very hostile toward her" and "told [her] that [she] was being too emotional." (Pl.'s Aff. ¶ 20, ECF No. 40-1.) She maintains that his tone was "dismissive" and that he did not take her complaints seriously because she is a woman. (*Id.*) The Plaintiff, however, does not dispute the designated evidence regarding her own actions during the meeting. According to Jerzyk's Affidavit, he contacted the Plaintiff by telephone on July 3, 2012, to discuss her complaints about her supervisors. During the conversation, she became "very loud, rude and belligerent" and continually interrupted him and refused to listen. (Jerzyk Aff. ¶ 23, ECF No. 39-1 at 46.) He advised her that she was becoming very emotional in raising her voice and refusing to listen without interruption. (*Id.* ¶ 25.) Jerzyk conducted a follow-up meeting on August 3, 2012, in which Ferracane also participated. The purpose was to review and address the Plaintiff's complaints, including her complaint that Jerzyk spoke to her unprofessionally on July 3. After the meeting, the Plaintiff submitted additional complaints to various members of the Defendant's administration. Ferracane continued to review the Plaintiff's claims and addressed all of her complaints in a correspondence dated August 5, 2012.

The Plaintiff's claim is difficult to comprehend. She appears to be asserting that, even though she was emoting and refusing to listen to Jerzyk, he had no right to make note of these actions and to postpone the resolution of her complaints. Seemingly, it is her belief that any comment about her emotional state was also a statement about her gender, as if only women can be characterized as emotional when they are loud and belligerent. Although that is her belief,

there is no evidence that it was Jerzyk's. Even if Jerzyk's comment—made in the context of trying to answer the Plaintiff's concerns while being continually interrupted—was a gender specific comment, it did not cross the line to "evidencing gender animus." *See, e.g., Hall v. City of Chi.*, 713 F.3d 325, 334–35 (7th Cir. 2013) (explaining the importance of context when deciding whether an ambiguous word evidences bias).

Summary judgment is the moment in litigation where the non-moving party is required to marshal and present the court with the evidence upon which a reasonable jury could rely to find in her favor. *See AA Sales & Assocs., Inc. v. Coni-Seal, Inc.*, 550 F.3d 605, 613 (7th Cir. 2008). The Plaintiff does not point to any evidence from which a factfinder could infer that Jerzyk treated her the way he did, at least in part, because she is a woman. The Plaintiff's "problems were not related to [her gender]—they were related to [her]. The fact that [s]he is a member of a protected class does not transform them." *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004). Even on summary judgment the Court does not draw inferences "that are supported by only speculation or conjecture." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (quotations marks omitted).

Further, even if gender animus could be implied by Jerzyk's comment, the Plaintiff has not made any attempt to show that his actions were part of a hostile work environment. This is not problematic as long as she is not pursuing a sexual harassment claim—and there is no indication that she is. But neither has the Plaintiff attempted to show how Jerzyk's response to her during the July 3 meeting adversely impacted her employment. That is problematic, because "[t]he requirement that a plaintiff show she suffered an adverse employment action as a result of her employer's alleged discrimination is an element of any Title VII claim." *Chaib v. Indiana*,

744 F.3d 974, 982 (7th Cir. 2014). Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" on the basis of the individual's sex. 42 U.S.C. § 2000e-2(a)(1). Title VII's prohibition against discrimination with respect to terms, conditions, or privileges of employment reaches only "material, sufficiently important alterations of the employment relationship (often referred to as 'adverse employment actions')"). *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 916–17 (7th Cir. 2007) (citing *Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006)). "A cognizable adverse employment action is a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Chaudhry v. Nucor Steel-Ind.*, 546 F.3d 832, 838 (7th Cir. 2008) (quoting *Bell v. EPA*, 232 F.3d 546, 555 (7th Cir. 2000)). The "purpose of the adverse employment action requirement is to provide a reasonable limiting principle for the type of conduct actionable under the statute." *Phelan v. Cook Cnty.*, 463 F.3d 773, 780 (7th Cir. 2006). "[A] statute which forbids *employment* discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 653 (7th Cir. 2000).

The Plaintiff's brief is lacking any analysis of the adverse employment action she suffered as a result of the July 3 (or August 3) meeting. Being told she was emotional would not suffice, no matter how it was said. *See Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1107 (7th Cir. 2012) (calling an employee a trouble maker, a cry baby, and a spoiled child was not materially adverse). The only possible employment action cited in her brief is Jerzyk's

14

"unwillingness to address her complaints." (Pl.'s Br. 9, ECF No. 40.) But the record shows that Jerzyk was attempting to address her complaints. And he continued to investigate her claims after the meeting and even involved Ferracane, the Vice President of Human Resources. Jerzyk and Ferracane both participated in a follow-up meeting with the Plaintiff. Ferracane then drafted a detailed and comprehensive correspondence to the Plaintiff addressing each of her claims about her immediate supervisors, Jerzyk, and himself.

A genuine issue of material fact exists only where there is enough evidence that a reasonable jury could return a verdict in favor of the nonmoving party. *Harper*, 687 F.3d at 306. The Plaintiff has not presented evidence from which a reasonable jury could conclude that her employer discriminated against her with respect to her compensation, terms, conditions, or privileges of employment on the basis of her sex, and the Defendant is entitled to judgment as matter of law on the Plaintiff's claim of gender discrimination.

### B.     Race Discrimination and Retaliation Claims—Indirect Method

The Plaintiff asserts that she can proceed to trial on her race discrimination and retaliation claims because she has established the necessary prima facie elements, and the Defendant's stated reasons for its actions are pretextual.

Under the indirect method of proving discrimination based on race, a plaintiff meets her initial burden by showing that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she was subject to an adverse employment action; and (4) similarly situated employees who were not members of the protected class were treated more favorably. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 815 (7th Cir. 2015). If a

plaintiff establishes a prima facie case of discrimination, the employer must "articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (quoting *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014)). The prima facie case for establishing retaliation is the same, except that the plaintiff must have engaged in statutorily protected activity and identify comparators who did not. *See Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007).

The Plaintiff claims that the Defendant subjected her to numerous adverse employment actions both before and after she filed her lawsuit. These include limiting her overtime opportunities, passing her over for more favorable positions, disciplining her, denying her training opportunities, failing to pay her a differential rate as a charge nurse, and cancelling her employment contract. The Plaintiff maintains that, for each of these actions, she has identified a similarly situated white Registry Nurse who was treated more favorably and can show that the Defendant's stated reasons for its actions are not credible.

1.      *Training Opportunities*

The Plaintiff complains that she was denied training, which impacted her "career opportunities by denying her the opportunity to possess a diversified portfolio of credentials." (Pl.'s Br. 15.) "[A] failure or refusal to train an employee based on that employee's membership in a protected class is an adverse action." *Chaib*, 744 F.3d at 982. Here, there is no evidence from which a jury could determine that training opportunities were withheld because of the Plaintiff's race, or any other protected status.

In June 2012, McBride sent an email to the Registry Department staff to inform them that training classes were being offered, which would allow the nurses to work in physician's offices. The Plaintiff responded that she was interested in the opportunity. When McBride received the training dates and times, she emailed the employees who had expressed interest, advising them of the times and noting that the training required consecutive days: "If you are available for both days and it does not incur any overtime please let me know." (June 28, 2012, email, ECF No. 39-5 at 5.) The next day, the Plaintiff responded that she was interested in the training, but because she had a contract for 40 hours per week, it would require overtime. She asked for clarification whether this meant she was precluded from taking the class. (June 29, 2012, email, ECF No. 39-5 at 6.) McBride responded,

> With it being overtime, unfortunately, we would have to wait until the next time it is scheduled. I can schedule you for another month when there is more notice and can work around your schedule without incurring overtime. The classes for August are not posted yet on the calendar. If you want to keep an eye out you can look on the calendar under Education & Training > Epic Training > Ambulatory > Clinician. I will also look a little later in July.

(June 29, 2012, email, ECF No. 39-5 at 6.) Of the eleven employees who responded to indicate their interest in attending the training, only one was able to complete the July training without incurring overtime.

The Plaintiff continued to inquire about the overtime issue and, eventually, filed a letter of complaint on July 2, 2012. She argued that she was being penalized and denied opportunities, and that it amounted to discrimination, targeting, and retaliation. In response, McBride assured the Plaintiff that she was not being denied training, and was free to coordinate her schedule to secure training as long as the training hours did not result in overtime. McBride assured the Plaintiff that this requirement applied to all Registry Nurses. McBride reminded the Plaintiff

that, although she had chosen to work 40 hours per week, she could amend this agreement to take advantage of training.

Again, to avoid summary judgment, a plaintiff must show that an adverse employment action was guided by an improper motive. *Chaib*, 744 F.3d at 984; *Coleman*, 667 F.3d at 845. In failure to train cases, the plaintiff must demonstrate "that she was not provided training under circumstances giving rise to an inference of discrimination, i.e., that she was denied training given to other similarly situated employees who were not members of the protected group." *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998). The Plaintiff has not pointed to a similarly-situated non-black employee who was treated more favorably. She attempts to bypass the requirement by arguing that the denial of training was an example of the Defendant's attempts to eliminate her overtime because nurses who are credentialed in more areas have more opportunities for overtime. Therefore, any nurse who lodged more overtime than she did in 2014 would be a similarly-situated white employee who was treated more favorably (even though she presents no evidence that nurses who worked more overtime in 2014 did so because they had received more training or were credentialed in more areas).

Even if such piggybacking were a permissible tactic, the Defendant has articulated a legitimate, nondiscriminatory reason for denying training where it would lead to overtime. Training hours were budgeted to the Registry Department, not to the department where a nurse worked or was trained. The Registry Department simply did not have a budget for such overtime. This training/overtime policy was communicated to all the interested employees and enforced without regard to race. The Plaintiff's only counter to this policy is an argument that, because she was only informed of the requirement *after* she expressed her interest in the training, it was

18

pretextual.

The Plaintiff does not explain how the timing of the communication regarding the overtime restrictions suggests that it was a dishonest reason. *See Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1002 (7th Cir. 2013) ("The focus of the pretext inquiry is whether the proffered reason is a lie.") "To show pretext, a plaintiff must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the defendant's proffered reasons that a reasonable person could find them unworthy of credence and hence infer that the defendant did not act for the asserted non-discriminatory reasons." *Bates v. City of Chi.*, 726 F.3d 951, 956 (7th Cir. 2013) (quotation marks and brackets omitted). The Plaintiff has not done this. The unrebutted evidence is that the overtime restriction was communicated to all of the interested employees at the same time and was enforced equally among the Registry employees. The Plaintiff's evidence does not cast doubt on whether training time was charged to the Registry Department, whether the Registry Department had a limited overtime budget, or whether the policy was administered consistently among all the Department's employees.

There is no evidence that the Plaintiff was treated differently than similarly situated employees in her request for training, or any other evidence to suggest that race was a factor in the training decisions. In the end (as will be discussed later in this Opinion) the Plaintiff has not even shown that a lack of training adversely impacted her employment through the elimination of overtime hours that she would otherwise have worked.

**2.    *Overtime***

In 2012, the Plaintiff worked more overtime hours than any other Registry Nurse. She

argues that this changed when the Defendant began efforts to limit her overtime opportunities by manipulating the Stafferlink system so she could not view certain shifts, and by denying her the ability to schedule 16-hour shifts. She submits that all of this discrimination and retaliation resulted in her falling, by 2014, to eighth on the list of Registry Nurses in terms of overtime hours worked.

The Plaintiff believes that the Defendant attempted to reduce her overtime hours by manipulating the Stafferlink system so that she would not be able to view all available shifts. The Plaintiff does not designate any evidence that would allow a trier of fact to conclude that the message system was being intentionally manipulated. The Plaintiff does not offer any analysis of whether other nurses experienced similar problems, and the problems she encountered could just as easily have occurred through an unintentional malfunction or, for that matter, through user error.

The Plaintiff has expressly invoked the indirect method of proof, which requires that she present evidence that similarly situated employees who were not members of the protected class were treated more favorably. *Preddie*, 799 F.3d at 815. To that end, she devotes a section of her brief to showing that comparably similar white nurses were treated more favorably. However, this section of her brief does not even mention the Stafferlink system. Instead, the Plaintiff makes comparisons by citing to total hours of overtime. She notes that, in 2014, seven nurses ranked ahead of her in the amount of overtime they worked. Of those seven, all were white except one, who was Hispanic. (Pl.'s Br. 17.)[3] Curiously, the Plaintiff does not present any evidence concerning her ranking in 2013, even though she alleges that the Defendant's efforts to

---

[3] The Plaintiff does not reveal that the eighth place ranking is out of fifty-four Registry nurses.

reduce her overtime opportunities began in 2012. A look at the ranking reveals the reason for this omission; it does not support the Plaintiff's claim of discriminatory treatment. Despite lodging fewer overtime hours in 2013 than she did in 2012, the Plaintiff was still ranked first, ahead of all the other nurses in the Registry Department. Thus, if problems with the Stafferlink system impacted scheduling, they were either not significant enough to move her out of first place for overtime hours, or they impacted everybody equally. Indeed, the records show that overtime hours decreased for all Registry Nurses in 2013 compared to 2012. No jury could find, based on this record, that the Defendant targeted the Plaintiff for reduced overtime, much less that they targeted her for a prohibited reason.

For the 2014 numbers, which the Plaintiff relies upon heavily to show that she suffered a materially adverse action (she holds 2014 out as the year in which her overtime had "nearly been eliminated" (Pl.'s Br. 17)), she again does not produce evidence of any issues with Stafferlink or attempt to show that she was similarly situated to the seven employees who worked more overtime. Incidentally, the only problem she cites in 2013 was that she was unable to see available shifts on March 9, 10, and 11, 2013. Detailed documentation of the shifts the Plaintiff worked in 2013 reveal that she worked 7:00 p.m. to 7:30 a.m. on March 9; 3:00 p.m. to 11:00 p.m. and 11:00 p.m. to 7:31 a.m. on March 10; and 10:30 p.m. to 7:36 a.m. on March 11, for a total of 38 hours in 3 days. Therefore, not only did she work more overtime than any other nurse in the Registry Department in 2013, but she worked significant hours on the very days she relies on to show she was being discriminated against.

In April 2014, the Plaintiff signed a short term contract to work 24 hours per week. (ECF No. 39-3 at 18.) Previously, the Plaintiff had consistently contracted to work 40 hours per week.

This reduced schedule of 24 hours per week continued for the remainder of 2014. It is difficult to understand how the Plaintiff would believe that she could continue to have more overtime hours than any other employee when she reduced her contract from 40 hours per week to 24 hours per week near the beginning of the year. Because the Plaintiff's presentation to the Court does not acknowledge this contractual change, she has not attempted to show that the nurses with more overtime were similarly-situated with respect to their contracted hours. Accordingly, she has not provided a comparison group that is similar to her in material respects so as to "suggest that she was singled out for worse treatment." *Crawford v. Ind. Harbor Belt RR. Co.*, 461 F.3d 844, 846 (7th Cir. 2006); *see also Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) (explaining that the purpose of the similarly situated prong is to eliminate other variables and help isolate the critical independent variable—discriminatory animus); *Filar v. Bd. of Educ. of City of Chi.*, 526 F.3d 1054, 1061 (7th Cir. 2008) ("The 'similarly situated' prong establishes whether all things are in fact equal.").

The Plaintiff also tries to put the blame for fewer overtime hours on the Defendant's decision to eliminate 16-hour shifts. She submits that in July 2013 she was told she could not schedule herself to work a 16-hour shift. The Defendant explains that all three hospitals within the System implemented the industry best practice for all patient care departments that registered nurses not be able to pre-schedule 16-hour shifts. The purpose of the policy was to limit the excessive nursing fatigue often experienced during a 16-hour shift, which jeopardizes the safety of both the patients and the nurses. This is a legitimate, non-discriminatory basis for not allowing the Plaintiff to schedule a 16-hour shift. The Plaintiff argues that this was not the real reason, and that discrimination was the real reason, because two white employees continued to pre-schedule

16-hour shifts.

The Plaintiff's lone support for the alleged discriminate application of the scheduling policy is her Affidavit testimony: "I spoke to a white registry nurse named Maria who works in the Float Pool and reports to Tammy Curean. Maria told me that she was still allowed to schedule herself for 16-hour shifts. I also saw on Stafferlink that a white registry nurse, Shawna Parker, pre-scheduled and worked a double shift on August 31, 2014." (Pl.'s Aff. ¶ 27.) However, the Plaintiff's Affidavit does not contain admissible evidence to show that similarly-situated white employees were treated differently.

Affidavits in support of motions for summary judgment must be made on personal knowledge and set forth facts that would be admissible in evidence. Fed. R. Civ. P. 56(c)(4)*; see also Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("a court may consider only admissible evidence in assessing a motion for summary judgment"); *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (inadmissible evidence will not overcome a motion for summary judgment). Because the Plaintiff is attempting to use what Maria told her (an out of court statement) to prove that Maria scheduled herself for 16-hour shifts, it is hearsay. *See* Fed. R. Evid. 801(c). Hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997); *see also Gunville*, 583 F.3d at 985 ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment."). The statement concerning what the Plaintiff observed in Stafferlink is not helpful either, because the Plaintiff has not shown that what she viewed meant that Parker actually worked a double shift. The only documentation presented to this Court shows that, for all of 2014, Parker only worked .25 hours of overtime.

It is appropriate to note that every Registry Nurse experienced a reduction in overtime hours from 2012 to 2014. This further supports the Defendant's contention that it was attempting to reduce certain types of overtime for the benefit of the patients and nurses both. The Court cannot allow a case to proceed to a jury where every employee is impacted in the same manner, and there is no other evidence in the record to suggest that the Defendant's decisions were based on race or a desire to retaliate for protected activity.

3.    *More Favorable Positions*

The Plaintiff maintains that she was passed over for positions at St. Mary Medical Center's Pain Clinic and/or Wound Clinic and Catheterization Lab. According to the Plaintiff's Affidavit, she was working the night shift at IMCU and "was looking for a more favorable position, preferably in a clinic setting." (Pl.'s Aff. ¶ 5.) On several occasions in 2012, she asked McBride "if there were any available positions for registry nurses." (*Id.*) Although she was told there were no available positions, "shortly thereafter" she "learned" that a white LPN in the Registry Department was given a contract with the Wound Clinic and that another white nurse was given a position at St. Mary's. (*Id.* ¶ 6.) The Plaintiff does not specify what length of time is meant by "shortly thereafter," or indicate how she "learned" about the other nurses' contracts or positions.

Before failure to promote can be considered an adverse action, a plaintiff must show that she properly applied for the position. *Hill v. Potter*, 625 F.3d 998, 1003 (7th Cir. 2010). The Plaintiff's act of inquiring about positions for Registry Nurses was not a proper application. It is not even clear that it was an inquiry about obtaining a new position, as opposed to an assignment

within a particular department. According to the Plaintiff's own statement, she inquired whether any positions were available in the clinics "for registry nurses." But according to the Defendant's designated evidence, Registry employees do not work in these clinics. Rather, obtaining a position in the St. Mary Medical Center Pain Clinic or Wound Clinic required submission of an application for an open position. An individual could only accept a position in the clinic if she resigned her position with the Registry Department. Indeed, the nurse who obtained the Wound Clinic position applied for it, received an offer, and resigned her position in the Registry Department.

The Plaintiff's Affidavit does not suggest that she told McBride that she was looking to apply for another position and resign her position as a Registry Nurse. Accordingly, nothing in the designated evidence shows McBride's response to be inaccurate or misleading. The Plaintiff's Affidavit cannot be used to contradict the Defendant's evidence regarding the procedures for obtaining a position in the clinic because it does not establish when or how the nurses she compares herself to obtained their positions. *See* Fed. R. Civ. P. 56(c)(4) (any affidavit used to oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated").

In addition to these deficiencies, the Plaintiff has not presented any evidence that the positions were objectively superior to her position as a Registry Department nurse. *See Chaib*, 744 F.3d at 983–84 ("Without concrete evidence showing that the terms and conditions of working at [another facility] are superior, rather than relying on bare conjecture, [the plaintiff] has not met her burden" to show adverse employment action). The Plaintiff contends only that

she was "looking for a more favorable position, preferably in a clinic setting." (Pl.'s Aff. ¶ 5.) But a plaintiff's subjective preference cannot establish an adverse action. *Id.* at 984 (just because the plaintiff subjectively considered a transfer "a more ideal fit or personally advantageous" did not "render its rejection adverse").

Based on the record of undisputed facts before the Court, there is no evidence from which a jury could conclude that the Plaintiff was passed over for a more favorable position, or that such an action was a result of discrimination.

**4.**     *Discipline*

The Plaintiff asserts that the counseling memorandum she received on February 19, 2013, was issued in retaliation for filing her complaint against the Defendant on October 18, 2012. Although she placed the analysis of this discipline in the section of her brief she designated for discussion of the racial discrimination and retaliation claims she intended to prove by the indirect method of proof, she does not identify a similarly-situated comparator and states that the disciplinary action is "part of her retaliation claim . . . and not subject to the *McDonnell-Douglas* analysis." (Pl.'s Br. 17–18) (referring to the indirect, burden-shifting method of proof developed by the Supreme Court in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973)). Whether the Plaintiff proceeds under the indirect or direct method of proof, she must show that the disciplinary action was an adverse action. *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 848–49 (7th Cir. 2007) ("Both approaches . . . require the employee to demonstrate an adverse action—under the direct method, he must show that it was a *result* of the protected activity, and under the indirect method he must show that he, and no one else who did not

complain, suffered the adverse action."). The Plaintiff's counseling record does not rise to the level of being an adverse action.

An action is materially adverse for purposes of retaliation if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation marks omitted). "'Even under the more generous standard that governs retaliation claims,' a reprimand 'without more' is not an adverse employment action." *Chaib*, 744 F.3d at 987(quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 902 (7th Cir. 2003)). The Plaintiff asserts that three corrective actions of any kind during a twelve-month period will result in termination, and that simply being "closer to termination" as a result of the action is sufficient to show that it was adverse. (Pl.'s Br. 13–14.) But the Plaintiff has not pointed to "a real harm" or to any evidence that the warning "affected [her] employment from that time forward." *Johnson*, 325 F.3d at 902. Further undercutting her claim that the counseling was materially adverse is the fact that it was prompted by an email that she does not dispute writing, in which she called her supervisor unprofessional, hostile, and dismissive, and stated that she only intended to communicate with a different supervisor. *See, e.g., Nichols*, 510 F.3d at 787 (holding that written notice was not materially adverse, especially considering that it was in response to the plaintiff's unsubstantiated allegations against another officer); *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 462 (7th Cir. 2007) (stating that an employer's truthful report was not an adverse action); *cf Pantoja*, 495 F.3d at 849 (holding that a reasonable jury could find disciplinary warnings involving procedural irregularities to be materially adverse). These are the precise matters addressed in the Counseling Memorandum.

Even if the disciplinary warning could be considered materially adverse, the Plaintiff would have to present evidence of causation, such as a pretextual reason for the action. *See Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002) ("[W]e remind that mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue."); *Naficy v. Ill. Dep't of Human Servs.*, 697 F.3d 504, 513 (7th Cir. 2012) (identifying circumstantial evidence that supports inference of retaliation to include "suspicious timing, evidence that similarly situated employees were treated differently, or evidence that the employer's stated reason for the adverse employment action was pretextual"). The two actions were separate by four months and the Plaintiff has made no attempt to identify a similarly-situated comparator. The Plaintiff does suggest that her discipline was pretextual, but she does not actually designate any evidence from which a jury could infer that the Defendant did not believe that the disciplinary action was warranted. The Defendant is entitled to judgment as a matter of law on the Plaintiff's claim that the disciplinary action was unlawful retaliation.

**5.     *Differential Pay Rate***

For each shift, the department manager selects one nurse to act as the Charge Nurse within the department for that shift. If a Registry Nurses is assigned, she does not receive additional pay for serving as a Charge Nurse. Registry Nurses are not generally selected to act as the Charge Nurse, unless unusual circumstances occur, such as a non-Registry Nurse calling off work. The Plaintiff was occasionally selected to be the Charge Nurse.

The Plaintiff asserts that, on July 22, 2012, she worked as a Charge Nurse but did not

receive the $2.00 an hour differential pay to which she was entitled. According to the Defendant, Registry Nurses were not eligible for Charge Nurse pay. But according to the Plaintiff's Affidavit, she spoke to another Registry Nurse, Kathleen Klemoff, who told her she did receive Charge Nurse pay. (Pl.'s Aff. ¶ 18.) Klemoff's Affidavit is also in the record, but it does not support the Plaintiff's assertions. Klemoff worked as a Registry Nurse before accepting a full time position in 2014 as a regular employee of the Rehabilitation Department of the Community Hospital in Munster, Indiana. In this position, she rotates with other department nurses to serve as the Charge Nurse. When she serves as Charge Nurse, she receives $1.00 per hour in additional pay. Klemoff states that this additional pay was not available to her when she worked in the Registry Department because Registry Department Nurses do not receive additional pay for serving as a Charge Nurse. (Klemoff Aff. ¶ 7, ECF No. 39-9 at 92.)

The Defendant asserts that the Plaintiff did not experience an adverse action because she was not denied anything to which she was entitled. In response, the Plaintiff argues that a jury should decide whether she was entitled to the pay because the Plaintiff's testimony is that Klemoff "told her she was receiving charge nurse pay while still assigned to the registry." (Pl.'s Br. 18, ECF No. 40.) The Plaintiff's Affidavit does not create a genuine issue of material fact because it contains hearsay. What Klemoff told the Plaintiff is an out-of-court statement that the Plaintiff is offering for the truth of the matter asserted—that Klemoff received extra pay when she was assigned to be a Charge Nurse. *See* Fed. R. Evid. 801(c). Therefore, the Court cannot consider it. *See Gunville*, 583 F.3d at 985 ("a court may consider only admissible evidence in assessing a motion for summary judgment"); *Eisenstadt*, 113 F.3d at 742 (hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a

trial).

"[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *Arizanovska v. Wal-Mart*, 682 F.3d 698, 702 (7th Cir. 2012) (quoting *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009)). Because the only evidence the Plaintiff offers to show that she was improperly denied pay is inadmissible, no reasonable jury could find in her favor.

**6.**     ***Employment Contract***

In her February 13, 2015, Response Brief, the Plaintiff, for the first time, claims that she suffered an adverse employment action when the Defendant cancelled her contract, leaving her with no guarantee of employment. According to the Plaintiff, "[o]n or about December 1, 2014, Plaintiff's contract with the IMCU West unit was cancelled without cause. A less senior nurse, Shawna Parker, was allowed to continue her contract, and another nurse with less seniority, Danielle Rodecki, was extended a new contract." (Pl.'s Br. 7.) The Plaintiff acknowledges that she was informed the contract was not renewed because the hospital indicated there was no longer a need. She argues that, if this were true, no contract would have been extended to less experienced nurses.

The problem with the Plaintiff's reliance on the nonrenewal of her contract as a basis to sue the Defendant, is that the hospitals decided whether to renew contracts, not any of the actors that the Plaintiff has identified as harboring discrimination against her. Additionally, there are far too many details missing from the record to be able to infer that unlawful discrimination was at the heart of any decision regarding the contract.

When the Plaintiff inquired as to why her contract at IMCU West had not been renewed, Alonzo told the Plaintiff that the hospitals informed her that they were not seeking any additional contracts. The Plaintiff then inquired why, if that was true, Parker and Rodecki were allowed to continue contracts with expiration dates past December 20, 2014. She stated that she had not been asked to change her shift, or she would have done so in order to continue her contract. Alonzo replied: "It is within the unit Manager's prerogative to request an agreement for scheduling purposes to fill needed shifts on their perspective units. This is not the prerogative of the Registry." (Dec. 1, 2014, email, ECF No. 40-4 at 2.) The Plaintiff answered back that, while this was true, all scheduling agreements had to be approved by Alonzo, giving her the final decision making authority. The Plaintiff urged that she was both qualified and willing to work the 3 to 11 shift, and should have been given the opportunity to fill the needs of the unit before the contract was given to another employee with less experience. The Plaintiff requested that she be provided the opportunity that was denied to her.

There is no way of knowing whether Alonzo's decision to approve Parker's and Rodecker's contracts without giving the Plaintiff an opportunity to enter the same agreement was based on the Plaintiff's race or her protected activity. Nothing in the record points to that being a reason because the Plaintiff does not provide any details regarding Parker and Rodecker except that they are white nurses. The Court is left wondering how the Plaintiff acquired her information about other employees' contracts at all. Moreover, even if the Plaintiff's evidence were sufficient to establish a prima facie case, she has not established that the Defendant's articulated reason was pretextual.

The Plaintiff's own evidence reveals that the nondiscriminatory reason for the

nonrenewal was that the hospital did not request any additional agreements, and the Registry management was not involved in the nonrenewal of the Plaintiff's contract. The Plaintiff does not identify the Unit Manager who had the prerogative to request an agreement, or allege that this person engaged in discrimination or retaliation. Instead, she argues that Alonzo should not have approved the other contracts that were requested without giving the Plaintiff an opportunity to adjust her schedule to meet the needs of the hospital instead. But the Plaintiff has no evidence to suggest that this was normal or acceptable procedure, or that Alonzo otherwise owed the Plaintiff such preferential treatment based solely on her prior years of service. *Cf. Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 645 (7th Cir. 2013) (noting that significant departure and deviations from established policies and practices could be circumstantial evidence of unlawful motives). It is not the province of this Court to determine whether the employer's practices are "fair, prudent, or reasonable" so long as the employer is not "using its managerial discretion as a foil for a discriminatory purpose." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014). Even if the Plaintiff was more experienced, it would not establish that the reason for the nonrenewal—that the hospital did not request any additional contracts—was untrue and was a "mask for discrimination." *Id.* (stating that even if the plaintiff's allegation were true, this made the manager bad at his job, not a perpetrator of illegal discrimination). The Plaintiff has not identified such "weaknesses, implausibilities, inconsistencies, or contradictions" in the Defendant's proffered reasons that "a reasonable person could find them unworthy of credence." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007).

## C.    Retaliation Claim-Direct Method

The Plaintiff submits that she has provided evidence sufficient to prove retaliation by the direct method. A plaintiff relying on the direct method of proof must present either direct or circumstantial evidence of: (1) engagement in a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the protected activity and the adverse action. *Barton v. Zimmer*, 662 F.3d 448, 455 (7th Cir. 2011); *Humphries v. CBOCS, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007).

Even though the Plaintiff has dedicated a separate section of her brief to analyzing her retaliation claims under the direct method of proof, her analysis is largely a repeat of her arguments under the indirect method of proof. For the reasons cited above, most of the actions of which the Plaintiff complains are not materially adverse. In addition, the Plaintiff does not have evidence of a causal connection between filing her lawsuit in October 2012, and the adverse actions.

Causation may be established through circumstantial evidence such as "suspicious timing, ambiguous statements, and other bits and pieces from which an inference of retaliatory intent might be drawn; evidence that similarly-situated employees were treated differently; and evidence that the employer's stated reason for the decision was pretext." *Harden v. Marion Cty. Sheriff's Dep't*, 799 F.3d 857, 862 (7th Cir. 2015) (quotation marks and brackets omitted). "The ultimate question the parties and the court always must answer is whether it is more likely than not that the plaintiff was subjected to the adverse employment action because of his protected status or activity." *Hobgood*, 731 F.3d at 644. The Plaintiff cites suspicious timing and pretext as evidence of retaliation.

As the discussion in the preceding section revealed, the Plaintiff has not satisfied her burden to show that any of the Defendant's legitimate, non-retaliatory reasons for its employment decision were a pretext for retaliation. That leaves the Plaintiff with suspicion timing, although many of the challenged actions took place several months after the Plaintiff filed her lawsuit. In any event, suspicious timing alone rarely establishes causation, but if there is corroborating evidence that supports an inference of causation, suspicious timing may permit a plaintiff to survive summary judgment. *See Coleman*, 667 F.3d at 860–61; *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005). "'The mere fact that one event preceded another does nothing to prove that the first event caused the second. . . . [O]ther circumstances must also be present which reasonably suggest that the two events are somehow related to one another.'" *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 895 (7th Cir. 2001) (quoting *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000)); s*ee also Scaife v. Cook Cnty.*, 446 F.3d 735, 742 (7th Cir. 2006) (noting that under ordinary circumstances, "[c]lose temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is *other* evidence that supports the inference of a causal link") (internal quotation marks omitted, emphasis added).

The Plaintiff attempts to offer one other piece of corroborating evidence, but it falls well short of establishing the causal link. She alleges that Alonzo made an "ambiguous statement" that suggests she harbors animus toward the Plaintiff for filing the lawsuit. The context of the statement defeats this claim. The evidence reveals that it was McBride, not Alonzo, who made the statement. On March 6, 2013, McBride wrote that her previous emails "did not, in any form or fashion, state or imply that you are 'unable to attend any of the educational and in-services at

St. Catherine Hospital.'" (Mar. 6, 2013 email, ECF No. 40-5 at 1.) McBride went on to explain that the course in question, Diabetes Review, was offered to nurses who worked at St. Catherine's, and that the Plaintiff had not worked there for over three years. She continued, "In the future, please do not distort the facts, take my comments out of context, or manipulate my communication to fit your agenda." (*Id.*) The Plaintiff argues that the reference to an "agenda" suggests animus for filing a lawsuit.

McBride did not venture to identify the Plaintiff's agenda, and her comments were a direct response to a particular assertion by the Plaintiff about what McBride had communicated to her. It would stretch the concept of reasonable inference too far to assign McBride's response the animus the Plaintiff urges. This piece of evidence, even when combined with the timing of all the events and considered in a light most favorable to the Plaintiff, is not sufficient to convince a reasonable jury that the Plaintiff was a victim of unlawful retaliation.

## CONCLUSION

For the reasons stated above, the Court GRANTS the Defendants' Motion for Summary Judgment [ECF No. 37]. The Defendants' Motions to Strike [ECF Nos. 41, 43] are RENDERED MOOT. The Clerk will enter judgment in favor of the Defendants and against the Plaintiff.

SO ORDERED on February 8, 2016.

s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION